**Norman A. NELSON, Appellant,**

v.

**Jean BOWLER et al., Appellees.**

**Appeal No. 79–630.**

United States Court of Customs and Patent Appeals.

July 31, 1980.

Rehearing Denied Nov. 6, 1980.

Robert A. Armitage, Kalamazoo, Mich., and Thomas J. Macpeak, Washington, D. C., for appellant; Peter D. Olexy, Washington, D. C., of counsel.

Paul N. Kokulis, Washington, D. C., for appellees; William T. Bullinger and J. D. Atkinson, of counsel.

Before MARKEY, Chief Judge, RICH, BALDWIN, and MILLER, Judges, and RE, Judge.*

RICH, Judge.

This appeal is from the decision of the United States Patent and Trademark Office (PTO) Board of Patent Interferences (board) awarding priority on all four counts to Bowler et al. (Bowler), the senior party. We reverse.

This interference involves two applications, serial No. 252,030, filed by appellant Nelson May 10, 1972, for "Composition and Process" and serial No. 474,608, filed by Bowler May 30, 1974, as a continuation of serial No. 248,717 filed April 28, 1972, for "Cyclopentane Derivatives." Appellee was accorded the benefit of an application filed in Great Britain on May 11, 1971, under 35 U.S.C. § 119, and was designated senior party. Only Nelson took testimony.

The real parties in interest are Upjohn Company, assignee of Nelson, and Imperial Chemical Industries, Limited, assignee of Bowler.

### The Subject Matter

Three counts remain in this appeal.[1] Counts 2 and 4 describe 16-phenoxy-substituted prostaglandins (PG's) which are admitted to be structurally related to known, naturally-occurring prostaglandins commonly designated $PGF_2$ and $PGE_2$.[2]

---

* The Honorable Edward D. Re, Chief Judge, United States Customs Court, sitting by designation.

1. Count 3 employed compounds within count 2 in a method of inducing luteolysis (abortion caused by separation of the corpus luteum from the uterine wall). This count was expressly abandoned by Nelson at oral argument and in his brief.

2. "Natural prostaglandins" refers to PG's which have structures corresponding to those which occur in nature. While the art can synthesize natural PG's, the "natural" designation is retained to identify structure rather than origin.

Count 1 is directed toward intermediates used to prepare the 16-phenoxy PG compounds of counts 2 and 4.

Naturally occurring PG's allegedly had recognized value in pharmacology at the time the present invention was made. Both parties stated as much in their respective specifications. Effects such as smooth muscle stimulation and blood pressure modulation were said to be reflected in various commercial applications. For example, labor induction or abortion was attributed to uterine smooth muscle stimulation caused by administration of PG's. Modification of blood pressure, on the other hand, was purportedly useful in treating either shock or hypertension since natural PG's can either raise or lower blood pressure.

### The Issue

The issue is whether Nelson has shown at least one utility for counts 1, 2, and 4 which sufficiently establishes an actual reduction to practice before the critical date of May 11, 1971. Specifically, is a practical utility manifested in testing 16-phenoxy PG's for their stimulation of smooth muscle tissue from gerbil colons and their modulation of blood pressure in rats?

### The Evidence

Two tests conducted at Upjohn before the critical date are relied upon by appellant to prove practical utility. They are referred to as the rat blood pressure (BP) test and the gerbil colon smooth muscle stimulation (GC–SMS) test. The comparison standards for both were selected from naturally occurring PG's, i. e., $PGE_1$ and $PGF_2$, having known blood pressure and smooth muscle stimulation responses.

In the BP test, the blood pressure of anesthetized rats recorded on a polygraph chart to determine whether an injected compound had any effect. Responses were categorized as either a depressor (lowering) effect or a pressor (elevating) effect. Calibration was supposedly achieved by comparing an unknown analog PG versus either a standard natural PG depressor, such as $PGF_2$, or a standard natural PG pressor, such as $PGE_1$. Each rat was given successive PG's to test. Allowance was made for the blood pressure to approach a normal level before administering another PG.

The tested compounds, labeled 38980 and 38669, were both reported to give an atypical or biphasic response. That is, both initially depressed the rat's blood pressure before raising it. The depressor effect was a temporary manifestation lasting several seconds. The subsequent pressor effect, however, was a strong response lasting several hours. Nelson exhibits 27 and 28, the test results for the above-mentioned compounds, reflect an equivalent activity between the above analog compounds and the naturally occurring compounds.

During the testimony period of this interference, Dr. James Weeks, another Upjohn research scientist, was questioned about the reliability of the BP test. He answered that, as of April 1971, this test had been in use for between five and six years. In that period, he said it gave excellent results.

The GC–SMS test was *in vitro* as opposed to the *in vivo* BP test. Purportedly, Upjohn technicians excised a section of colon from a freshly-killed gerbil for suspension in a physiological solution. A lever arm was connected to the colon in such a way that any contraction was recorded as a polygraph trace. For comparison purposes, PGE, a known smooth muscle stimulant, was employed. Both of Nelson's tested analog compounds were said to closely approximate the response of the natural compounds.

### Board Decision

Both conception and preparation by Nelson of compounds within the scope of counts 1, 2, and 4 were held to have occurred prior to the critical date. Since the counts did not recite any utility, the board declared that the 16-phenoxy PG's, could have any practical utility, i. e., utility sufficient for an actual reduction to practice, citing *Blicke v. Treves*, 44 CCPA 753, 241 F.2d 718, 112 USPQ 472 (1957). But priority was not awarded to Nelson because his

evidence was held not to show adequate proof of practical utility.

The tests used by Nelson were characterized as "rough screens, uncorrelated with actual utility." The board said neither the biphasic pressor effect in rats nor the stimulation of gerbil colon smooth muscle revealed a practical utility, citing *Rey-Bellet v. Engelhardt*, 493 F.2d 1380, 181 USPQ 453 (Cust. & Pat.App.1974). The present situation was compared to that in *Knapp v. Anderson*, 477 F.2d 588, 177 USPQ 688 (Cust. & Pat.App.1973), where only a potential utility was established.

Finally, Nelson's conduct, as evidenced by statements in his application, was evaluated for inequitable conduct which might establish fraud. The clear and convincing proof necessary to establish fraud was held to be missing. The board stated that Bowler failed to show how Nelson had either misled the examiner or knowingly presented false information. Speculative statements of utility were found insufficient to establish inequitable conduct.

## OPINION

### *Practical Utility*

■ The board correctly stated that evidence of any utility is sufficient since the counts do not recite any particular utility. *Blicke v. Treves*, supra. However, we cannot agree with its conclusion that the pharmacological activity evidenced by the BP and the GC–SMS tests does not establish a practical utility. Even though Nelson now admits that antifertility activity such as luteolysis is not proven by these tests, the board erred in not recognizing that tests evidencing pharmacological activity may manifest a practical utility even though they may not establish a specific therapeutic use.

"Practical utility" is a shorthand way of attributing "real-world" value to claimed subject matter. In other words, one skilled in the art can use a claimed discovery in a manner which provides some immediate benefit to the public.

■ Knowledge of the pharmacological activity of any compound is obviously beneficial to the public. It is inherently faster and easier to combat illnesses and alleviate symptoms when the medical profession is armed with an arsenal of chemicals having known pharmacological activities. Since it is crucial to provide researchers with an incentive to disclose pharmacological activities in as many compounds as possible, we conclude that adequate proof of any such activity constitutes a showing of practical utility.

■ Bowler argues that the BP and GC–SMS tests are inconclusive showings of pharmacological activity since confirmation by statistically significant means, i. e., a 4-point assay,[4] occurred after the critical date. But a rigorous correlation is not necessary where the test for pharmacological activity is reasonably indicative of the desired response. While Dr. Brown, an Upjohn PG researcher, testified that treatment of one muscle with various successive compounds, as done here, could involve a small residual carryover effect from one compound to another, he also indicated that the correlation between the "preliminary" test and 4-point assays was reasonably certain. In view of the above correlation, the 4-point assay, while preferable, was not the sole means for establishing practical utility.

We also do not attach much significance to the atypical blood pressure response in the BP test. The record states that the biphasic nature was predominantly a sustained pressor effect, a known activity of certain natural PG's[5] with established therapeutic uses. Nor are we concerned with the admitted variability of smooth muscle responses. Even with known PG's the response differs among smooth muscles. The controlling point is that these responses are evidence of pharmacological activity. As this court said in *Blicke*, supra,

4. A 4-point assay consists of testing one compound against one standard in either four rats or on four gerbil colons.

5. In fact, Charles Lawson, an Upjohn research associate, stated that sometimes even PGF2 manifested a biphasic effect.

* * * whether a composition of matter must be tested in order to establish a reduction to practice, and if so, what tests are necessary, is a question which must be decided on the basis of the facts of the particular case involved.

This appeal is not analogous, as the board suggests, to *Rey-Bellet v. Engelhardt,* supra, even though the issues are similar. There, a new drug, nortriptyline (NTL), and one of its known analogs, amitriptyline (N-methyl substituted NTL), were tested. The results were subsequently offered to prove practical utility for NTL. For example, the "General Mental Health Screening Test" was designed to check for "physical responses." The presence or absence of a response in a test animal after an injection could have indicated pharmacological activity.

The inherent lack of certainty in this test resulted in a failure to prove practical utility. While Engelhardt advocated that pupil dilation evidenced anticholinergic activity,[6] this court did not find adequate correlation between them. The Mental Health test was found not to be specific for the claimed activity since drugs without that activity could have caused pupil dilation.

We specifically note that anticholinergic activity was the sole utility maintained by Engelhardt for the purposes of the Mental Health test. He did not argue that pupil dilation in itself was a useful pharmacological activity. Without such an argument, proof of pupil responses, alone, did not establish an actual reduction to practice.

Engelhardt also argued that since amitryptyline, a compound of proven utility, had a very close structural similarity to NTL and produced similar test results, the utility of NTL had been proved. However, the Mental Health test was found to be unsuitable for detecting any of the known useful pharmacological activities possessed by the analog. Thus Engelhardt's argument of utility based upon analog similarity

was equally invalid because of inconclusive proof.

Another test in *Rey-Bellet,* the "tetrabenazine antagonism" test, supposedly evidenced antidepressant activity. Mice tranquilized by tetrabenazine were said to simulate depressed humans and animals. Antagonizing or offsetting the tranquilizer was interpreted as a sign of activity.[7] This court concluded that insufficient experience with the test precluded a showing of "the necessary correlation between tetrabenazine antagonism in mice and antidepressant activity in man [or animals]." *Rey-Bellet,* 493 F.2d at 1384, 181 USPQ at 456.

█ We find *Rey-Bellet* to be distinguishable on its facts. According to the present evidence, specific pharmacological activities, i. e., smooth muscle stimulation and blood pressure modulation, were recognized as practical utilities. These activities were directly measured by dispositive tests. In other words, one skilled in the art at the time the tests were performed would have been reasonably certain that 16-phenoxy PG's had practical utility.

Bowler urges that *Knapp v. Anderson,* supra, supports their contention that the instant tests were evidence only of potential utility. We disagree. The laboratory testing in *Knapp* was conducted outside the "intended functional setting" and was not related to pharmacological activity. A claimed amine was allegedly useful as an ashless dispersant in lubricants for internal combustion engines. This court found that one skilled in the art would not find a practical utility solely in the results of a bench test for sludge dispersancy. Nor could one reasonably predict a practical utility therefrom since the losing party failed to establish a correlation between performance in the bench test and that within an engine.

Here, however, a correlation between test results and pharmacological activities has

---

6. Anticholinergic action describes the blocking of neural impulses passing along the parasympathetic or autonomic nervous system which includes ocular nerves.

7. Again, we note that tranquilizer antagonism alone was not argued to be a practical utility.

been established. The BP test inherently was of such a nature since it is performed *in vivo* and directly evidences the claimed activity. While the GC–SMS test is *in vitro*, both parties admit that it adequately simulates *in vivo* colon smooth muscle stimulation.

### Fraud

Bowler must demonstrate that Nelson committed fraud by clear and convincing evidence. *Norton v. Curtiss*, 57 CCPA 1384, 1408, 433 F.2d 779, 797, 167 USPQ 532, 546–47 (1970). We agree with the board that he has not carried this heavy burden.

While Bowler accurately states that an applicant must recite utility with as reasonable a certainty as possible, i. e., without total disregard of facts within his knowledge, the speculative inaccuracies in Nelson's alleged utilities amount at most to simple negligence. While we do not sanction the use of boilerplate utility disclosures without regard to known contrary facts, this alone is insufficient to support a charge of fraud. Nowhere does Bowler show a clear intent by Nelson to mislead the examiner by false utility statements.

### Summary

In the final analysis, every utility question arising in an interference must be decided on its own facts. Relevant evidence is judged as a whole for its persuasiveness in linking observed properties to suggested uses. Reasonable correlation between the two is sufficient for an actual reduction to practice. For the above reasons, we hold that Nelson sustained his burden of proving a prior actual reduction to practice.

The decision of the board awarding priority on counts 1, 2, and 4 to Bowler is *reversed*.

*REVERSED.*